**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-01326-CMA-MEH

FORNEY INDUSTRIES, INC., a Colorado corporation,

    Plaintiff,

v.

DACO OF MISSOURI, INC., a Missouri corporation, d/b/a KDAR COMPANY,

    Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

In this trademark infringement and unfair competition case, Forney Industries, Inc. ("Forney") alleges that KDAR Company's use of a particular color combination in the packaging of its metalworking products violates the Lanham Act and Colorado common law. However, because Forney cannot establish that its alleged mark has attained "secondary meaning" as a matter of law, Defendant's Motion for Summary Judgment (Doc. # 38) is granted.

### I. BACKGROUND

Forney, a distributor of metalworking and welding products, brought this Complaint against Daco of Missouri, Inc., d/b/a KDAR Company ("KDAR"), in October of 2013, alleging that KDAR "intentionally used a color combination and arrangement

substantially similar to the Forney Color Mark on the packaging of its Metalworking Products that compete directly with Forney Metalworking Products," and that the use of this mark "is likely to cause consumer confusion as to the source or origin of the KDAR Metalworking products." (Doc. # 1, ¶¶ 20, 22.) Specifically, Forney alleges that its use of "a red, then yellow, then black banner with white letters color combination and arrangement" constitutes a distinctive "Color Mark."[1] (*Id.*, ¶¶ 9, 10, 13; *see also* Doc. ## 2-1, 2-2, 2-3.)

On December 24, 2013, Forney submitted an application to the United States Patent and Trademark Office ("USPTO"), to obtain a trademark registration for the colors red and yellow on the packaging of its metalworking and welding products ("Trademark Application 1"). (Doc. # 38-1.) In Trademark Application 1, Forney attested that its earliest use of these colors on its product packaging was March 2011 for metalworking products and June 2012 for welding products. (*Id.* at 2.) On April 14, 2014, the USPTO refused Forney's Trademark Application 1, explaining that the applied-for color mark was not inherently distinctive, competitors already used similar colors on their packaging, and the colors had not acquired distinctiveness; the USPTO requested Forney's response to the refusal. (Doc. # 38-2.) On May 1, 2014, Forney submitted a second application to the USPTO to obtain a trademark registration for the colors red, yellow, and black on the packaging of its metalworking and welding products ("Trademark Application 2"). (Doc. # 38-3.) In its Trademark Application 2, Forney again attested that its earliest use of these colors on its product packaging was March

---

[1] The Court will use this term as a shorthand way of describing the particular selection and arrangement of colors on Forney's packaging.

2011 for metalworking products and June 2012 for welding products. (*Id.* at 2.) On September 16, 2014, the USPTO denied Forney's Trademark Application 2 for the same reasons it had denied Trademark Application 1; the USPTO requested Forney's response to the refusal. (Doc. # 38-4.)

On November 19, 2014, the USPTO issued its final decision on Trademark Application 1 and refused registration because the applied-for color mark was not inherently distinctive, competitors already used similar colors on their packaging, and the colors had not acquired distinctiveness. (Doc. # 38-5.) The USPTO further found that, because Forney's "mark" was only a combination of colors and nothing more, neither "trade dress" nor protection for a particular package design was at issue. (*Id.* at 2.)

In deposition testimony, Forney CEO Steve Anderson admitted that Forney's packaging colors have not remained uniform over time. (Doc. # 38-22 at 239:12-21) ("Q: In fact, . . . haven't you applied to have the U.S. Patent and Trademark Office recognize your color mark as a trademark on three separate occasions?" "A: I think that the color mark has changed over those times, over those periods.") KDAR also submitted undisputed evidence that the use of the colors red, yellow, black and white for the packaging of metalworking products is not unique or exclusive; specifically, it submitted photos showing that ten different companies use red, yellow, black and/or white in their packaging of metal grinding wheels, and six different companies use these colors in their packaging of welding wire products. (Docs. ## 38-25, 38-26.)

KDAR filed the instant Motion for Summary Judgment, arguing that Plaintiff cannot prevail on its unfair competition claims against KDAR as a matter of law. (Doc. # 38.)

## II. STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III. ANALYSIS

The Lanham Act makes actionable the "deceptive and misleading use" of trademarks and protects "persons engaged in . . . commerce against unfair competition." 15 U.S.C. § 1127. Section 32 of the Lanham Act protects registered trademarks, whereas Section 43(a) of the Act "prohibits a broader range of practices than does § 32." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 858 (1982). Section 43(a) protects qualifying unregistered trademarks, and gives a seller or producer a cause of action against any person whose use of a word, symbol or device is likely to cause confusion regarding the source or origin of the plaintiff's goods. 15 U.S.C. § 1125(a)(1)(A). Although courts – including the United States Supreme Court – were initially skeptical about whether colors could qualify for Lanham Act protection, that issue has been definitively resolved. *See, e.g., Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 174 (1995) (holding that green-gold color of manufacturer's press pad could qualify for trademark protection); *Christian Louboutin S.A. v. Yves Saint Laurent*

*Amer. Holdings, Inc.*, 696 F.3d 206, 225 (2d Cir. 2012) (same, with regard to the bright red, lacquered outsoles of Louboutin high heels); *Bd. of Supervisors for La. State Univ. Agric. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (same, with regard to universities' color schemes and other identifying indicia).  In *Qualitex*, the Supreme Court explained that colors may qualify for the Act's protection because

> over time, customers may come to treat a particular color on a product or its packaging (say, a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand.  And, if so, that color would have come to identify and distinguish the goods – i.e., "to indicate" their "source" . . . .

514 U.S. at 163.

However, "[b]y their nature, color marks carry a difficult burden in demonstrating distinctiveness and trademark character."  *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1127 (Fed. Cir. 1985).  Specifically, the use of particular colors qualifies for protection only upon a showing of so-called "secondary," or acquired, meaning.  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000).  "Secondary meaning" refers to the level of distinctiveness that a descriptive mark must attain in the minds of consumers before it is eligible for trademark protection.  *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1154 (10th Cir. 2013).  "Secondary meaning" occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."  *Wal Mart Stores, Inc.*, 529 U.S. at 211 (quoting *Inwood Labs., Inc.*, 456 U.S. at 851, n. 11); *see also* 2 McCarthy on Trademarks and Unfair Competition § 15:5 (4th ed.) ("The prime element of secondary meaning is a

6

mental association in buyers' minds between the alleged mark and a single source of the product.")  A mark "either has secondary meaning or it does not."  *Water Pik, Inc.*, 726 F.3d at 1154.  Whether or not a trademark has acquired secondary meaning is generally a question of fact; however, where the underlying facts are undisputed, as in this case, the question of secondary meaning is appropriate for resolution on motion for summary judgment.  *See Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988).

A plaintiff may establish secondary meaning "through the use of direct evidence, such as consumer surveys or testimony from consumers."  *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) (citation omitted).  A plaintiff may also rely upon "circumstantial evidence regarding: (1) the length and manner of [the mark's] use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."  *Id.* (citations and internal quotation marks omitted).[2]

In the instant case, Forney submits no direct evidence, such as surveys, to indicate that consumers associate its Color Mark with Forney; instead, it relies exclusively on circumstantial evidence that its Color Mark has achieved secondary meaning.  Citing no legal authority, the sole evidence Forney provides in support of its assertion that its Color Mark has achieved secondary meaning is as follows:

---

[2]  Additionally, a court may consider evidence of intentional copying when assessing whether a product has achieved secondary meaning.  *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 (10th Cir. 2002).  However, because Forney does not rely on such evidence, the Court does not discuss this factor.

- "Forney adopted the Color Mark in 1990 to distinguish its retail metalworking products form [sic] those of its competitors. [Anderson Decl.] [¶¶ 6, 7, 8, 18, 19, 20, 21, 22, and 23.] None of Forney's traditional competitors used the color combination or the arrangement when Forney adopted the mark and have not used it over the past 25 years." (Doc. # 43 at 10.)

- "Over the past 25 years Forney has advertised it [sic] metalworking products bearing the Color Mark in displays at over 10,000 retail stores in every state and every city in the United States. [Anderson Decl.] at [¶¶] 6, 7, 8, 18, 19, 20, 21, 22, and 23." (*Id.* at 11.)

- "The color marks [sic] unique combination of the red into yellow background with the black banner and white letters stands out as the main feature of the products and displays. [Anderson Decl.] at [¶¶] at 19, 22-23." (*Id.*)

- "Forney has sold over $500,000,000 worth of these mostly low cost consumer goods bearing the Forney Color Mark over the past twenty years. [Anderson Decl.] at [¶] 19." (*Id.*)

KDAR argues that this limited evidence is insufficient to prove that its Color Mark has attained secondary meaning. As discussed below, the Court agrees.

As for evidence pertaining to the advertising and promotion of the Color Mark, "'[t]he critical question in considering the evidence is not the extent of the promotional efforts but their effectiveness in creating an association' between the trade dress and plaintiff." *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1470 (D. Kan. 1996); *see also Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138,

1146 (9th Cir. 2009) ("To demonstrate secondary meaning based on advertising, the advertising must be of a 'nature and extent to create an association' with the advertiser's goods."); *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC,* 259 F.3d 25, 44 (1st Cir. 2001) (affirming the district court's finding that the "advertising did not emphasize any particular element of its trade dress, and thus could not be probative of secondary meaning").

Forney states that "[o]ver the past 25 years Forney has advertised it [sic] metalworking products bearing the Color Mark in displays at over 10,000 retail stores in every state and every city in the United States." (Doc. # 43 at 11.) However, that consumers were exposed to advertising, even at thousands of retail stores, is not probative of whether consumer sales were stimulated by the Color Mark, nor that consumers associated the Color Mark with Forney in particular. *See Water Pik*, 726 F.3d at 1154-55 (concluding that, as to secondary meaning, "[e]vidence that [plaintiff's] products had millions of users and that its products were sold through well-known retailers does not tell us whether the sales were stimulated by the mark. That its products were shown on the Oprah Winfrey Show on at least one occasion is not enough to establish that consumers thereafter connected the mark and the product."); *see also* 1 McCarthy on Trademarks § 8:8 ("[S]econdary meaning cannot usually be proven by advertising that merely pictures the claimed trade dress and does nothing to emphasize it or call attention to it.") (footnotes omitted).

*In re Owens–Corning*, 774 F.2d at 1126–27, provides a helpful point of distinction. In that case, the Federal Circuit Court of Appeals held that a manufacturer

9

of residential insulation had shown secondary meaning as to the color pink, because the company spent $42 million in advertising its product with slogans that directly highlighted the "pinkness" of the product and thus promoted an association in the consumer's mind between the pink color and the source of the product.  *Id.*  These slogans included "Pink of Perfection"; "The Pink Cooler"; "Big Pink"; "Love that Pink"; "Pink Power"; "America's Favorite Pink Product"; "Tickled Pink"; "Put your House in the Pink"; "Up with Pink"; "Prime Time Pink"; "Think Pink"; "Think More Pink"; "Beat the Cold with Pink"; "All that Pink"; and "Plant Some Pink Insulation in your Attic."  *Id.*  In that case, the plaintiff also introduced its product to its dealers with the explanation that it was "colored pink so your customers will recognize it as the latest and the best!" *Id.* at 1127.

In contrast, Forney's advertising utterly fails to mention the Color Mark, or to emphasize it in any fashion, so as to promote an association between Forney's product and its source.  *See* (Doc. # 43-1 at ¶ 23) (emphasis in original) (showing advertisement display without any reference to the Color Mark, and noting that "[t]he image below is of a typical Forney Retail Metalworking display.  It shows what **consumers** see when visiting one of the 10,000 retail outlets serviced by Forney.")  Indeed, the only evidence Forney offers in support of the fact it has promoted an association in consumer's minds is its conclusory assertion that "the color marks [sic] unique combination of the red into yellow background with the black banner and white letters **stands out as the main feature** of the products and displays." (Doc. # 43 at 11) (emphasis added).  It cites Forney's CEO's Declaration in support of this proposition.  (*Id.*)  However, Forney's own

10

evaluation of the "main feature" of its products and displays is simply not competent evidence to demonstrate that **consumers** also believed that the Color Mark was the "main feature" of the packaging, much less that its Color Mark achieved secondary meaning. See *Honeywell Int'l, Inc.*, 366 F.3d at 875 (noting that conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing Fed. R. Civ. P. 56(e)) ("the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."); *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 CIV. 3599 RWS, 2012 WL 3240442, at *7 (S.D.N.Y. Aug. 7, 2012) ("Although the Amended Complaint does allege that Plaintiff's trade dress case has become associated with the Urban Rebounder in the eyes of the public, there are no facts alleged to support this conclusory claim.")

Although Forney points to its long-time use of its Color Mark, "[t]o acquire secondary meaning, a descriptive mark must have been used so long and **so exclusively** by one producer with reference to his goods" that it has acquired distinctiveness. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 n.4 (10th Cir. 2002) (citing *J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir. 1985)). As such, it is significant that the USPTO concluded that many competitors use similar colors to those in the Color Mark, and also that Defendant has submitted undisputed evidence indicating that many other companies employ similar colors in their packaging of similar products. See (Docs. ## 38-1 to -5; 38-25; 38-26). That Forney's

11

Color Mark has not been uniform over time, and that use of the colors in its Color Mark is not unique, means that consumers will not, by definition, associate the Color Mark with Forney.[3]  See *Forschner Group, Inc. v. Arrow Trading Co., Inc.,* 124 F.3d 402, 408 (2d Cir. 1997) (holding that use of the color red on multifunctional pocket knives by three competing companies meant that color red did not primarily designate the plaintiff as the single source of the product); *Mana Products, Inc. v. Columbia Cosmetics Manufacturing, Inc.,* 65 F.3d 1063, 1071 (2d Cir. 1995) (holding that the color black did not identify the plaintiff as the source of the cosmetics because "countless numbers of cosmetics companies . . . sell black compacts.").

Forney also points to the fact that it "has sold over $500,000,000 worth of these mostly low cost consumer goods bearing the Forney Color Mark over the past twenty years." (*Id.*)  However, evidence pertaining to raw sales figures, standing alone, is not indicative of secondary meaning, because sales volume may be related, instead, "to factors other than source identification." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 (10th Cir. 2002); *see also Water Pik, Inc.*, 726 F.3d at 1154-55 ("[e]vidence that [plaintiff's] products had millions of users and that its products were sold through well-known retailers does not tell us whether the sales were stimulated by the mark"); *J.M. Huber Corp.*, 778 F.2d at 1470 (holding that a party failed to establish secondary meaning despite introducing evidence establishing that it had used a mark for as long

---

[3] Forney asserts that "none of Forney's traditional competitors used the color combination or the arrangement when Forney adopted the mark and have not used it over the past 25 years." (Doc. # 43 at 10.) Although Forney does not define "traditional competitors," this argument is contradicted by undisputed evidence in the record, as to many other companies who are employing similar color combinations for competitive products. (*See* Docs. ## 38-25, 38-26.)

as thirty-four years, had sold $45 million in product, spent approximately $500,000 in advertising, and distributed 12,000 catalogs annually to end users and supply stores).[4]

In sum, after more than two years of litigation, Forney offers little more than speculation and conjecture to support the proposition that the Color Mark has acquired secondary meaning. It offers no direct evidence of secondary meaning, such as consumer surveys, and its circumstantial evidence, as detailed above, amounts to general descriptions of its advertising efforts (which make no mention of its Color Mark) and its conclusory assurances that consumers see its Color Mark as distinctive and that consumers mentally connect the Color Mark with Forney. Viewing the record in the light most favorable to Forney, a reasonable jury could not infer secondary meaning from these facts. Indeed, federal decisions have rejected claims of secondary meaning by plaintiffs who provided considerably more circumstantial evidence than Forney presents here. *See, e.g., Braun, Inc. v. Dynamics Corp. of Am.,* 975 F.2d 815, 826–27 (Fed. Cir. 1992) (reversing jury verdict); *Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.,* 65 F.3d 1063, 1071 (2d Cir. 1995) (affirming summary judgment); *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264 (7th Cir. 1989) (affirming summary judgment); *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863 (8th Cir. 1994) (reversing district court findings); *Al–Site Corp. v. VSI Intern., Inc.,* 174 F.3d 1308, 1327 (Fed. Cir. 1999) (reversing jury verdict); *Investacorp, Inc. v. Arabian Investment Banking Corp.*

---

[4] Although not dispositive, the Court also notes that the USPTO has concluded, on multiple occasions, that Forney's Color Mark was not distinctive. Although Forney argues that evidence of the USPTO's conclusions is "not relevant" (Doc. # 43 at 4), "[t]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

*(Investcorp) E.C.,* 931 F.2d 1519 (11th Cir. 1991) (affirming summary judgment). Because Forney has failed to establish that its Color Mark has achieved secondary meaning, it cannot state a claim for trade dress infringement or unfair competition against KDAR under 15 U.S.C. § 1125(a).

With respect to Plaintiff's common-law trademark infringement and unfair competition claims, the Court declines to exercise supplemental jurisdiction over these two remaining state-law claims. "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir.1998)); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (footnote omitted) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.")[5]

---

[5] Nonetheless, the Court notes that under Colorado law, "a trade name or trademark must have acquired a secondary meaning or significance for its use to constitute unfair competition." *MacPhail v. Stevens*, 41 Colo. App. 99, 101-02, 586 P.2d 1339, 1341 (1978) (citing *Am. Furniture Co. v. American Furniture Co.*, 261 P.2d 163 (1953); *Wood v. Wood's Homes, Inc.*, 519 P.2d 1212, 1214 (1974)). Although there is paltry legal authority regarding this issue, it appears that secondary meaning under Colorado law is established under similar circumstances as under federal law. See *Wood*, 519 P.2d 1212, 1214 (1974) (noting that secondary meaning is acquired "by prior and continuous use of a name for a long period of time, the public mind identifies the user or the name with the particular service or goods furnished by him, and thereby identifies the product by the name.") As such, it appears to this Court that these claims would be dismissed if brought in state court.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. # 38) is GRANTED and this case is accordingly DISMISSED WITH PREJUDICE. It is

FURTHER ORDERED that Plaintiff's Cross-Motion for Partial Summary Judgment (Doc. # 39) and Defendant's Unopposed Motion to Supplement Motion for Summary Judgment (Doc. # 50) are DENIED as moot. It is

FURTHER ORDERED that Defendant shall have its costs by the filing of a Bill of Costs with the Clerk of the Court within ten days of the entry of judgment. Each party shall bear its own attorney fees.

DATED:	May 29, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge